UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

JOY AJIBOSE,

                              Plaintiff,

                                                              **MEMORANDUM & ORDER**
                    v.                                        15−CV−03346

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                              Defendant.

-----------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

        Plaintiff Joy Ajibose ("Plaintiff") brings this action under 42 U.S.C. § 405(g), seeking

judicial review of the Social Security Administration's (the "SSA") denial of her claim for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act").  The

parties have cross-moved for judgment on the pleadings.  (Dkts. 11, 22.)  Plaintiff seeks reversal

of the Commissioner's decision, with remand for further administrative proceedings and other

relief ordered by the Court.  The Commissioner seeks affirmation of the denial of Plaintiff's claims.

For the reasons set forth below, the Court GRANTS Plaintiff's motion for judgment on the

pleadings, DENIES the Commissioner's motion, and REMANDS for further proceedings.

## BACKGROUND

### A.  Procedural History

        Plaintiff applied for DIB on April 11, 2012, (Tr. 12[1]), and claimed disability beginning on

April 11, 2012 due to depression.  (*Id.*; Tr. 127, 131.)  On September 18, 2012, the SSA denied

---

[1] "Tr." refers to the Administrative Transcript.  (Dkt. 11.)  Page references are to the
continuous pagination of the Administrative Transcript supplied by the Commissioner.

Plaintiff's claim for DIB. (Tr. 41-44.) Plaintiff requested a hearing before an administrative law judge ("ALJ") on November 1, 2012. (Tr. 49.) ALJ Jerome Hornblass held a hearing on November 14, 2013, at which Plaintiff appeared with counsel. (Tr. 23.) In his decision dated January 16, 2014, the ALJ concluded that Plaintiff had not been under a disability within the meaning of the Act during the April 11, 2012 to January 16, 2014 period, and denied her claim for DIB. (Tr. 12-19.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review on May 11, 2015. (Tr. 1-4.) Plaintiff timely filed the present action on June 5, 2015. (Dkt. 1.)

### B. Non-Medical Evidence: Plaintiff's Self-Reporting and Testimony

*May 22 and June 4, 2012 Disability Reports*. Plaintiff was born on December 31, 1964 and was 47 years old on the onset date of her alleged disability. (Tr. 127.) Plaintiff reported her highest level of education to be the twelfth grade.[2] (Tr. 132.) In the years leading up to her claimed disability onset date of April 11, 2012, Plaintiff held multiple full-time positions. (Tr. 132.) From August 2000 to August 2007, Plaintiff worked as a supervisor at JP Morgan Chase. (*Id.*) From August 2008 to October 2008, Plaintiff held a temporary position as a "scanner" at the company CACI. (*Id.*) From April 2009 to July 2009, Plaintiff held another temporary position in the payroll and time sheets department at the Interstate Masonry Corporation. (*Id.*) From August 2011 to October 2011, Plaintiff worked as a customer service representative for Teletech Inc. (*Id.*) And from October 2011 to April 2012, Plaintiff worked as a customer service representative for the company Convergys. (*Id.*) Plaintiff reported that she was fired from her customer service representative position at Convergys in April 2012 due to a drop in her statistics, which, in turn,

---

[2] Elsewhere in the record, however, Plaintiff suggests that she also attended two years of college through an online program. (*See, e.g.*, Tr. 176.)

was caused by her inability to concentrate; she has not held another job since that date. (Tr. 131.)

***June 4, 2012 Function Report.*** Plaintiff completed a function report dated June 4, 2012. (Tr. 137-145.) In the report, Plaintiff described her daily routine as follows: she wakes up, says a prayer, takes a shower, dresses, and takes her kids to school. (Tr. 138.) Back at home, she cleans, cooks, and washes. (*Id.*) She notes that she prepares meals "every other day" because "being in front of the stove gives me ideas [about] what I can do with fire." (Tr. 139.) Although Plaintiff prepares her own meals, she notes that she does not cook as much as she used to because "with all the hass[le] it makes me angry." (*Id.*) Plaintiff also cleans, does laundry, and irons. (*Id.*) Plaintiff reports being able to shop in stores for food, personal items, and clothing, for about 1-2 hours at a time. (Tr. 141.) Plaintiff is also able to pay bills, count change, and handle a savings account; however, she reported her ability to handle money has changed because she does not think before she spends money on things. (*Id.*) Notwithstanding the above, Plaintiff noted that on some days, she cannot bring herself to move from her bed. (Tr. 138.) Plaintiff reported that when she is "in one of her moods," she does not talk with anyone and wants to be left alone. (Tr. 143.) She will lie in bed and sleep or watch television. (*Id.*)

Plaintiff notes that the biggest change for her since the onset of her disability was problems paying attention and focusing on her priorities at hand. (*Id.*) She notes that before her depression, "I was able to work without having the feeling to tell everyone I speak to shut up. I was loving and would care for anyone and listen attentively to anyone speaking to me." (*Id.*) Plaintiff notes that when placed in a setting where she has to listen to someone speak or in a conversation with anyone, she spaces out and wishes the person would just "shut up." (Tr. 144.) She cannot finish activities she starts, including reading a book or using the computer. (*Id.*) Plaintiff reported she has difficulty remembering things, which sometimes makes her so angry that she punches the wall.

(Tr. 145.)  Plaintiff also reported difficulty sleeping, which is sometimes "so bad I usually walk up and down the apartment day and night."  (*Id.*)  She takes medication to help her sleep.  (*Id.*)  Plaintiff checked off a box indicating she is capable of following written instructions, but noted also that she has problems getting along with people in authority, without elaboration.  (Tr. 144.)

Socially, Plaintiff attends church three days a week and therapy once or twice a week.  (Tr. 140, 142.)  Plaintiff does not report any problems with personal care or grooming.  (Tr. 139.)  She is able to walk, drive a car, ride in a car, and use public transportation.  (Tr. 140.)  Plaintiff is able to go out alone, but most of the time has her kids with her to "keep an eye" on her.  (Tr. 141.)  Her hobbies are watching television and playing games with her kids; however, she does not currently watch television or play with her kids as much as she used to because those things "get [her] angry."  (Tr. 141-42.)  Plaintiff also no longer calls her sister like she used to because she does not want to be bothered and does not feel like talking to anyone.  (Tr. 142.)  She stated that she cannot tolerate her family because they always want to "run [her] life."  (*Id.*)

***November 14, 2013 ALJ Hearing.***  At her hearing before the ALJ, Plaintiff testified that she believes she has suffered from depression since before coming to the United States in 1990, back in her home country of Guyana.  (Tr. 25, 31.)  However, she testified that she sought treatment for depression for the first time after her husband cheated on her at the end of 2011 and her symptoms worsened.  (Tr. 29-31.)  Plaintiff also left her job in customer service, which she was doing from home, around that time because she "started getting frustrated with people" and could no longer tolerate her job.  (Tr. 28-29.)  Plaintiff elaborated that she felt she could not work—even if only in front of the computer—because she "cannot be around people for too long," she gets frustrated or angry, her concentration level is "not like it was before," and she "forget[s] things."  (Tr. 29, 33-34.)  Plaintiff also stated that she has had suicidal thoughts, including one just the

previous night, and that after a recent suicide attempt, her therapist appointments have increased in frequency, from every other week to weekly. (Tr. 34-35.) Plaintiff stated that she took Vistaril for anxiety twice a week; Abilify every day for anxiety; and trazodone to help her sleep. (Tr. 36.)

As for her daily life, Plaintiff stated that she does not leave her apartment often. (Tr. 31.) She used to go to church, but no longer attends church regularly because she cannot bring herself to. (Tr. 32.) Plaintiff has five children, the youngest two of whom still live with her. (Tr. 26, 27.) Plaintiff stated that she "make[s] sure there's food there for them," and that she handles the household duties "sometimes," but that on other days her 15-year-old daughter would, for instance, do the laundry. (Tr. 33.) Plaintiff stated that her medications, particularly the Abilify, make her sleepy, and that she takes five or six "catnaps" every day. (Tr. 36.) Finally, she noted that in addition to her weekly therapy sessions, she sees a doctor for medications every month. (Tr. 30.)

At the end of the hearing, Plaintiff's attorney stated to the ALJ, "I feel that after you are able to see more of her records, and after hearing her testimony today, you will find that [Plaintiff] meets listing 12.04 of the Social Security listings." (Tr. 37.) The ALJ thereafter asked whether the attorney had materials she wanted to send to him, and the attorney responded that there were "records [that] should be coming into my office today or tomorrow. I'd like to send them to you." (Tr. 37-78.) The ALJ indicated that the attorney should get them to him by the following week. (Tr. 38.) At no point did the ALJ inquire of the attorney whether the records were complete.

### C. Medical Evidence

#### 1. Lutheran Family Health Centers, Sunset Terrace Family Health Center (STFHC)

The administrative transcript contains records from three visits to Lutheran Family Health Centers, the mental health facility at which Plaintiff received treatment for her depression, dated February 28, 2012, March 8, 2012, and March 26, 2012. (Tr. 164-175.) At the ALJ hearing,

Plaintiff's attorney indicated that he had more medical records to send to the ALJ. (Tr. 38.) However, the medical records submitted following the ALJ hearing were simply duplicates of two medical records already in the transcript. (*See* Tr. 202-08.)

*February 28, 2012 Visit (**Justin Grotelueschen, M.S.W.**[3]).* At the urging of her 21-year-old daughter, Plaintiff visited STFHC and had an initial screening with Mr. Grotelueschen, on February 28, 2012. (Tr. 164.) Plaintiff reported experiencing symptoms of depression since December 2011, when her second husband told her he cheated on her. (*Id.*) Plaintiff noted she also suffered depressive symptoms during her first marriage in Guyana because her husband was physically and emotionally abusive. (*Id.*) Plaintiff noted having infrequent suicidal thoughts and that she "talks herself out of it." (*Id.*) On a mental status examination, Benjamin Figueras, L.C.S.W.,[4] described Plaintiff's mood as euthymic,[5] affect as appropriate and of full range, thought process as intact, and thought content as unremarkable. (*Id.*) Cognitive functioning was normal; and insight, judgment, and impulse control were good. (*Id.*) Mr. Figueras noted the primary diagnosis for Plaintiff was depressive disorder and indicated a global assessment of functioning ("GAF")[6] score of 65. (Tr. 165.) Mr. Grotelueschen signed off on Figueras's notes and

---

[3] "M.S.W." is an abbreviation for "Master of Social Work."

[4] "L.C.S.W." is an abbreviation for "Licensed Clinical Social Worker."

[5] Euthymic is defined as "pertaining to a normal mood in which the range of emotions is neither depressed nor highly elevated." Mosby's Medical Dictionary (9th ed. 2009), http://medical-dictionary.thefree dictionary.com/euthymic (last visited September 30, 2016).

[6] GAF is a rating of overall psychological functioning on a scale of 0 to 100. A rating of 41-50 signifies serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning. A rating of 51-60 means moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). A rating of 61-70 means some mild symptoms (*e.g.*, depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, with some

recommended individual psychotherapy.  (Tr. 166.)  He scheduled a follow-up appointment for March 8, 2012 for intake purposes.  (*Id.*)

**March 8, 2012 Visit (*Cari Leslie, L.M.S.W.*[7]).**  Plaintiff returned to STFHC on March 8, 2012 for an initial psychosocial assessment with social worker Cari Leslie.  (Tr. 167.)  Plaintiff stated that she had never attended therapy before.  (*Id.*)  Plaintiff reported that ever since she learned her husband was cheating on her, she has had difficulty sleeping, concentrating, and was always screaming at her children.  (*Id.*)  She stated that she was angry, experienced pain inside, and did not know how to address her anger appropriately.  (*Id.*)  On a psychosocial assessment examination, Ms. Leslie reported that Plaintiff had an appropriate appearance, behavior, and insight.  (Tr. 169.)  Ms. Leslie described Plaintiff's mood and affect as depressed and anxious, speech as normal (though noted poor verbal skills), thought processes as coherent, and thought content as characterized by helplessness.  Ms. Leslie noted no memory problems or disorientation. (*Id.*)  Ms. Leslie described Plaintiff as being "socially isolated" and assessed depressive disorder and a GAF score of 50.  (*Id.*)  She noted that Plaintiff would follow up in three weeks.  (*Id.*)

**March 26, 2012 (*Beverly Robert, N.P.*[8]).**  On March 26, 2012, Plaintiff returned for an initial diagnostic interview with Beverly Robert, N.P.  (Tr. 171-73.)  Plaintiff reported poor appetite, less sound sleep, socializing less often, and feeling very irritable most of the time.  (Tr. 171.)  She stated that she worked full-time as a customer service representative and felt impatient with customers most of the time.  (*Id.*)  Plaintiff stated that she had some suicidal ideation, but had

---

meaningful interpersonal relationships. *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text revision, 2000).

[7] "L.M.S.W." is an abbreviation for "Licensed Master of Social Work."

[8] "N.P." is an abbreviation for "Nurse Practitioner."

not thought about how she would hurt herself.  (*Id.*)  She also complained of feeling violent toward her husband, but stated that she would not hurt him because of her children.  (*Id.*)

On a mental status examination, Ms. Robert described Plaintiff's attitude as "cooperative well-related," appearance as "well-nourished," mood as "depressed irritable," and affect as constricted.  (Tr. 172.)  Ms. Robert noted Plaintiff's thought process was "intact," while thought content was characterized by "anxious preoccupation."  (*Id.*)  Her impulse control was fair, insight was good to fair, judgment was good, and intelligence was in the normal range.  (*Id.*)  Ms. Robert assessed that Plaintiff was relapsing, noting that Plaintiff reported periods of depression in the past and that her current symptomatology was "the worst ever."  (*Id.*)  Ms. Robert assessed depression with anxiety and a GAF score of 55.  (*Id.*)  Ms. Robert prescribed Prozac (10 mg) and individual psychotherapy, and noted that Plaintiff would follow up in two weeks.  (Tr. 173.)  A notation dated two days later indicated that Plaintiff met the admission criteria and was assigned to "J. Roberts" and "K. Carter" for further treatment.  (Tr. 174.)

### 2.  Other Medical Evidence

***Consultative Examination (Mark Weinberger, Ph.D.).***  On August 17, 2012, Dr. Michael Weinberger, a psychologist, examined Plaintiff.  (Tr. 176-79.)  Dr. Weinberger noted she was extremely tearful during the evaluation and reported sadness; constant crying spells; irritability; feeling hopeless, helpless, and worthless; fatigue and loss of energy; social withdrawal; and lack of motivation.  (Tr. 176-77.)  Plaintiff also complained of difficulty falling asleep and staying asleep, though reported a normal appetite.  (Tr. 176.)  Plaintiff stated that she was easily overwhelmed on simple tasks.  (Tr. 177.)  Plaintiff also stated that she likes to feel pain, and sometimes bites herself or punches the wall out of frustration with her husband.  (*Id.*)  Plaintiff

told Dr. Weinberger that she was seeing Beverly Robert for medication management once a week and Keith Carter on a biweekly basis for psychotherapy. (Tr. 176.)

Dr. Weinberger concluded that Plaintiff's problems "may significantly interfere with [her] ability to function on a daily basis." (Tr. 179.) On a mental status examination, Dr. Weinberger found that Plaintiff had coherent and goal-directed thought processes, a depressed and tearful affect, and a dysthymic mood.[9] (Tr. 177.) Dr. Weinberger noted Plaintiff's attention and concentration, as well as recent and remote memory skills, were mildly impaired, likely due to emotional distress; for instance, he observed that Plaintiff could perform simple counting and calculations but had trouble with "serial 3s," *i.e.*, counting down backwards by threes, reciting: "20, 18, 15, 13." (Tr. 178.) He noted that Plaintiff's insight and judgment were both good, and she could dress, bathe, and groom herself; cook and prepare food; clean and do laundry; shop and manage money; drive; and take public transportation. (*Id.*) Dr. Weinberger further concluded that Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, and perform complex tasks independently. (*Id.*) He also concluded that Plaintiff could make appropriate decisions, but cannot relate adequately with others or appropriately deal with stress "at this time." (Tr. 178-79.) Dr. Weinberger diagnosed Plaintiff with "adjustment disorder with depressed mood" and recommended continued psychological and psychiatric treatment. (Tr. 179.)

**T. Harding, Ph.D.** On September 17, 2012, State agency psychological consultant T. Harding, Ph.D., reviewed Plaintiff's treatment records and consultative examiner's report, and completed a psychiatric review technique and mental residual functional capacity assessment

---

[9] Dysthymia is defined as a "continuous long-term (chronic) form of depression." Overview of Dysthymia, Mao Clinic, http://www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/home/ovc-20166590 (last visited September 30, 2016).

form. (Tr. 180-99.) Dr. Harding assessed that Plaintiff's psychiatric limitations were mild to moderate in severity. (Tr. 198.) Dr. Harding concluded that Plaintiff was able to understand and follow simple directions, make basic work-related decisions, interact in a cooperative manner, and tolerate the types of change present in an unskilled work setting. (*Id.*)

**Joanne Camille, Ph.D.** On June 17, 2014, approximately five months after the ALJ issued his decision, Joanne Camille, Ph.D., a psychologist affiliated with the Lutheran STFHC, completed a "Treating Physician's Wellness Plan Report" for Plaintiff.[10] (Tr. 5-6.) The report appears to have been completed in connection with Plaintiff's participation in a New York City public assistance program. (*Id.*) The Appeals Council declined to consider this record on the ground that the new information was about the time period post-dating the ALJ decision. (Tr. 2.)

Dr. Camille listed Plaintiff's diagnoses as obsessive compulsive disorder (OCD), mood disorder, and personality disorder. (Tr. 5.) The onset date for all three was listed as March 26, 2012. (*Id.*) With regard to relevant clinical findings, Dr. Camille stated that Plaintiff continued to experience OCD-type symptoms, and depressive symptoms "mainly due [to] psychosocial stressors." (*Id.*) Dr. Camille also noted that Plaintiff continued to attend her appointments at STFHC and was compliant with her medications, listed as fluoxetine HCL (80mg), Abilify, Vistaril (taken when necessary), and trazodone HCL (taken when necessary). (*Id.*) Dr. Camille checked a box indicating that Plaintiff's conditions had either resolved or stabilized, though wrote that "[Plaintiff] continues to experience depressive symptoms." (Tr. 6.) She also checked a box indicating that Plaintiff was unable to work for at least 12 months. (*Id.*) When asked to provide

---

[10] It is unclear whether Dr. Camille examined Plaintiff personally, as she did not check a box to indicate whether she based her conclusions on her own examination of Plaintiff, a review of Plaintiff's chart, or reports from other specialists. (Tr. 6.)

specific limitations, Dr. Camille stated that Plaintiff "is unable to be in crowded rooms. [It] becomes too stimulating when people are talking too much." (*Id.*)

## DISCUSSION

### A. Standard of Review

Unsuccessful claimants for disability benefits under the Social Security Act (the "Act") may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the Court's duty "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotations and citations omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (alterations and internal quotation marks omitted)). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal citation omitted). However, the Court is mindful that "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). Under any circumstances, if there is substantial evidence in the record to support the Commissioner's findings as to any fact, they are conclusive and must be upheld. 42 U.S.C. § 405(g); see also *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013). The Court will not defer to the Commissioner's determination if it is "'the product of

legal error.'" *Duvergel v. Apfel*, No. 99 CIV. 4614, 2000 WL 328593, at *7 (S.D.N.Y. Mar. 29, 2000) (internal citations omitted.)

**B. Eligibility Standard for Social Security Disability Benefits**

To be eligible for Social Security benefits, a claimant must establish "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and must demonstrate disability status by presenting medical signs and findings, established by "medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *but see Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel or by a paralegal.") (internal alterations and quotation marks omitted.)

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Act as set forth in 20 C.F.R. § 404.1505(a). If at any step the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there. First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled. If not, the ALJ proceeds to the second step to determine whether the claimant suffers from a "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is "severe" if it "significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the impairment is not severe, the claimant is not disabled. If it is, the ALJ proceeds to the third step, which considers whether the impairment meets or equals one of the impairments listed in the Act's regulations ("Listings"). 20 C.F.R. § 404.1520(a)(4)(iii);

*see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. In the context of mental impairments, this step requires an ALJ to include a specific finding with respect to the claimant's degree of limitation in each of four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § § 404.1520a(c)(3), 404.1520a(e)(4).

If the ALJ determines at step three that the claimant has a listed impairment, the ALJ will find the claimant disabled. If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" ("RFC") before moving onto steps four and five. A claimant's RFC is an assessment of "the most [the claimant] can still do despite [his or her physical or mental] limitations." 20 C.F.R. § 404.1545(a)(1). At the fourth step, the ALJ considers whether, in light of the claimant's RFC, he or she is able to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If so, the claimant is not disabled. If not, the ALJ proceeds to the fifth step, where the burden shifts to the ALJ to demonstrate that the claimant has the capacity to perform other substantial gainful work which exists in the national economy, considering the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). If so, the claimant is not disabled. If not, the claimant is disabled and entitled to benefits. *Id.*

### C. The ALJ's Decision

On January 16, 2014, the ALJ issued a decision by denying Plaintiff's DIB claim. (Tr. 12-19.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of April 11, 2012. (Tr. 14.) At step two, the ALJ found that Plaintiff had the severe impairment of depression. (*Id.*) At step three, the ALJ found that the impairment did not meet or medically equal the severity of one of the listed impairments under Listing 12.04 (Affective Disorders). (*Id.*) In reaching this conclusion, the ALJ found that Plaintiff did not have

"marked" limitations in at least two of the following areas: (1) activities of daily living; (2) maintaining social function; (3) maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Sec 12.04(B). Rather, the ALJ concluded that Plaintiff had only a "mild" restriction in activities of daily living and "moderate" difficulties with social functioning, concentration, persistence, or pace. (Tr. 15.) The ALJ found no evidence of any episodes of decompensation. (*Id.*) As the ALJ found that Plaintiff's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, he concluded that Plaintiff did not have a listed impairment within the criteria set forth in Listing 12.04. (*Id.*)

The ALJ next concluded that Plaintiff possessed the RFC to perform simple tasks that do not require working with others on more than occasional basis. (*Id.*) In making this RFC determination, the ALJ relied on the three STFHC records from February and March 2012, as well as the consultative evaluation performed by Dr. Weinberger and the state agency consultative psychologist, Dr. Harding. (Tr. 16-18.) The ALJ disregarded as not entirely credible Plaintiff's own statements concerning intensity, persistence, and limiting effects of her symptoms, noting that the objective medical evidence does not establish that Plaintiff would be precluded from all work activity. (Tr. 15-18.) The ALJ also pointed out that Plaintiff could perform most activities of daily living, such as dressing, bathing, and grooming herself; cooking and preparing food; cleaning and doing laundry; shopping; managing money; driving; taking public transportation; and taking care of her children. (Tr. 18.) The ALJ concluded that while she suffered from limitations, the mental status examinations of Plaintiff's treating physicians and Dr. Weinberger demonstrated that Plaintiff still retained the capacity to function adequately to perform many basic activities associated with work. (*Id.*)

The ALJ concluded at step four that in light of this RFC, Plaintiff was unable to perform any of her past relevant work as a customer service representative, which requires working with the public on a frequent basis. (Tr. 18.) At step five, however, the ALJ concluded that there were unskilled jobs that existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 19.) In making this determination, the ALJ considered Plaintiff's RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. (Tr. 18.) The ALJ concluded at the end of the five-step inquiry that Plaintiff was not disabled and denied her claims for benefits. (Tr. 19.)

**D. Analysis**

Plaintiff's primary argument on this Social Security appeal is that the ALJ failed to adequately develop the record and secure records and medical source statements from Plaintiff's treating mental health professionals. (Dkt. 22 at ECF 11-12.) The Court agrees with Plaintiff and holds that the ALJ did not fulfill his obligation to fully develop the medical record.

The Second Circuit has held that an "ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks and brackets omitted); *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) ("When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.") (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980))). An ALJ has an obligation to affirmatively develop the record even where the claimant is represented by counsel,

as here; in such a case, however, the ALJ need only seek additional information to fill "obvious gaps" in the record. *See Rosa v. Callahan*, 168 F.3d 72, 79 & n.5 (2d Cir. 1999) (*quoting Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)); *see also Eusepi v. Colvin*, 595 Fed. Appx. 7, 9 (2d Cir. 2014) (summary order).  This duty to develop the record has its roots in the Commissioner's regulatory obligation to ascertain a claimant's complete medical history before making a disability determination.  *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. § 404.1512(d)-(f) (2014));[11] *see also Corporan v. Comm'r of Soc. Sec.*, No. 12-cv-6704, 2015 WL 321832, at *2 (S.D.N.Y. Jan. 23, 2015).  Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record."  *Scott v. Astrue*, No. 09-cv-3999, 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-cv-5782, 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.").

Specifically, the Social Security Regulations (the "Regulations") provide that where a claimant alleges that her disability began less than 12 months before filing her application, the SSA "will develop your complete medical history beginning with the month you say your disability began unless we have reason to believe your disability began earlier."  20 C.F.R. §

---

[11] The Court notes that effective March 26, 2012, the Commissioner amended the Regulations to remove paragraph (e) of § 404.1512 and the duty it imposed on ALJs to re-contact a disability claimant's treating physician under certain circumstances. *See Lowry v. Astrue*, 474 F. App'x 801, 805 (2d Cir. 2012); How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651, 10,656 (Feb. 23, 2012) (deleting former paragraph (e) and re-designating former paragraph (f) as paragraph (e)); *see also Bushansky v. Comm'r of Soc. Sec.*, No. 13-cv-2574, 2014 WL 4746092, at *7 (S.D.N.Y. Sept. 24, 2014) (discussing amended regulations).

404.1512(d)(2).  The Regulations provide that the SSA will make "every reasonable effort" to help

a claimant obtain medical reports from her treaters when the claimant gives the SSA permission

to request the reports.  20 C.F.R. § 404.1512(d).  "Every reasonable effort" is defined as an initial

request for evidence and, at any time between 10 and 20 calendar days after the initial request, if

the evidence has not been received, one follow-up request.  20 C.F.R. § 404.1512(d)(1).  While

the ALJ has a clear duty to obtain a claimant's medical history for at least the 12 months preceding

the month of application, whether the ALJ has a duty to develop the record with respect to treating

sources *after* the date of filing is not settled in this Circuit and has been held to depend on the facts

of the case.  *See Moreira v. Colvin*, No. 13-cv-4850, 2014 WL 4634296, at *5 (S.D.N.Y. Sept. 15,

2014) (comparing *Brown v. Comm'r of Soc. Sec.*, 709 F. Supp. 2d 248, 257 (S.D.N.Y. 2010)

("[T]he duty to develop the record extends only with respect to the 12-month period prior to the

filing date of the claimant's application for benefits."), *with Pettey v. Astrue,* 582 F. Supp. 2d 434,

437 (W.D.N.Y. 2008) (holding that the ALJ's failure to develop the record for the period that

elapsed between the plaintiff's application and hearing date constituted legal error)); *see also Scott

v. Astrue*, 09-cv-3999, 2010 WL 2736879, at *14 n.60 (E.D.N.Y. July 9, 2010) (finding *Pettey* rule

appropriate where ALJ had knowledge of claimant's changed condition between the time of the

application and the time of the hearing).

Here, Plaintiff's claimed onset disability date was April 11, 2012, the same date that she

filed her DIB application.  Plaintiff reported that she began experiencing symptoms of depression

in December 2011, and she underwent an initial screening at STFHC in February 2012.  The Court

finds that the facts of this case support applying the affirmative duty to develop the record to the

period after the submission of the application until the date of the ALJ's decision in January 2014.

Plaintiff repeatedly testified and self-reported that she received regular treatment, including

therapy and prescription medications, from STFHC for her depression. For instance, Plaintiff reported in her May 22, 2012 Disability Report that her treatment included weekly therapy at STFHC; she also noted that her last office visit was April 23, 2012, and that her next visit was May 25, 2012. (Tr. 133-134.) On August 17, 2012, Plaintiff told Dr. Weinberger that she was "currently seeing Beverly Roberts [sic] for medication management once per week and Keith Carter on a biweekly basis for psychotherapy." (Tr. 176.) Finally, at the November 2013 hearing before the ALJ, Plaintiff testified that following recent suicidal thoughts, the frequency of treatment with her therapist changed from biweekly to weekly. (Tr. 34.)

Despite Plaintiff's repeated references to receiving regular treatment at STFHC through 2012 and 2013 in her submissions to the SSA, the **only** three records from STFHC in the administrative transcript are dated February 28, March 8, and March 26, 2012—all of which are self-described "initial screenings" or "diagnostics" that suggest that more patient-specific and intensive treatment was to follow. For instance, these same records reference future therapy sessions and follow-up appointments at STFHC, including with a "J. Roberts" and "K. Carter." (Tr. 174.) The administrative record does not show that the ALJ ever inquired into obtaining treatment notes from Plaintiff's weekly therapy sessions with Keith Carter or the medication management appointments with Beverly Roberts, or that the ALJ sought to contact any of Plaintiff's treaters for medical source statements. The Court finds that the lack of any medical records between March 26, 2012 and January 2014 is a glaringly "obvious gap" in the record, and the ALJ erred in not making any attempt to contact STFHC to inquire about this gaping hole. Indeed, the ALJ does not even flag the issue at the hearing or inquire of the attorney whether the records were complete. Nor does he confront it in his decision.

The Commissioner contends that the two duplicative STFHC records submitted by Plaintiff's counsel following the ALJ hearing, which were date-stamped November 4, 2013, suggests that Plaintiff "did not receive any further treatment" at STFHC and that re-contacting the facility would have been futile. (Dkt. 18 at ECF 5.) But this is pure speculation. Neither the facility nor the attorney made any representation that the records were complete. *Cf. Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) (summary order) (ALJ has no duty to further develop the record where claimant's attorney submitted additional post-hearing materials and then represented that the medical record was complete).[12] And there is no indication in the record or from the Commissioner's motion papers that the SSA ever attempted to contact STFHC to confirm that no additional records were available. The Court rejects the Commissioner's attempt to shirk its duty to develop the record, where the gap is as glaring as here. (*See* Dkt. 11 at ECF 21 ("Plaintiff and her attorney were repeatedly advised of the importance of submitting any additional medical evidence that would support Plaintiff's claim.").) Similarly, the Court rejects the Commissioner's argument that "there is no indication that Plaintiff or her attorney requested further time to provide any additional evidence or for assistance from the ALJ in obtaining any medical evidence." (*Id.*) Where the record is as sparse as here, the ALJ's affirmative duty to develop it is paramount.

In light of the sparse medical record, the Court finds that the ALJ further erred in making a disability determination before obtaining a medical source statement from a treating physician.

---

[12] The fact that Plaintiff attorney did not represent at the administrative proceedings that the record was complete—coupled with its obvious incompleteness—distinguishes this case from those cited by the Commissioner, in which the medical evidence available to the ALJ already appeared substantial and the ALJ was entitled to rely on representations that it constituted the full record. *See Lynn v. Comm'r of Soc. Sec.*, No. 11-cv-917, 2013 WL 1334030, at *12 (E.D.N.Y. Mar. 30, 2013) ("In this case, it is not clear that the record was in fact inadequate."); *Rivera v. Comm'r of Soc. Sec.*, 728 F. Supp. 2d 297, 330 (S.D.N.Y. 2010) ("[I]t is not clear that the record, which is fairly voluminous, was inadequate to determine disability.").

A medical source statement is an opinion of "what an individual can still do despite a severe impairment, in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." SSR 96-5p, 1996 WL 374183 (July 2, 1996); *see also* 20 C.F.R. §§ 404.1513(b)(6). While an ALJ's failure to obtain a medical source statement from a treating physician before making a disability determination is not necessarily an error requiring remand, *see Tankisi v. Comm'r of Social Sec.*, 521 F. App'x. 29, 33-34 (2d Cir. 2013) (citing 20 C.F.R. § 404.1513(b)(6)), the need for a treating physician's opinion hinges on the "circumstances of the particular case, the comprehensiveness of the administrative record," and "whether ... [the record,] although lacking the opinion of [the] treating physician, was sufficiently comprehensive to permit an informed finding by the ALJ." *Sanchez v. Colvin*, No. 13–CV–6303, 2015 WL 736102, at *5–6 (S.D.N.Y. Feb. 20, 2015) (citing *Tankisi*, 521 F. App'x at 33-34); *see also Swiantek v. Comm'r of Social Sec.* 588 F. App'x. 82, 84 (2d Cir. 2015) ("[T]his Court does not always treat the absence of a medical source statement from a claimant's treating physicians as fatal to the ALJ's determination."). For an ALJ to make a disability determination without seeking any treating physician opinion, there must be "no obvious gaps in the administrative record," and the ALJ must "[possess] a 'complete medical history.'" *Hooper v. Colvin*, No. 15-cv- 6646, 2016 WL 4154701, at *13 (S.D.N.Y. Aug. 5, 2016) (citing *Rosa*, 168 F.3d at 83 n. 5 (quoting *Perez*, 77 F.3d at 48)).

Here, no "complete medical history" existed such that the ALJ could arrive at an RFC determination without obtaining medical source statements from treating physicians. As noted above, while Plaintiff received treatment from February 2012 through the date of the ALJ's decision on January 2014, the ALJ based his disability determination on three initial screening records from February and March 2012, and a consultative examiner's report in August 2012. Courts have remanded where the medical record available to the ALJ is not "robust" enough to

obviate the need for a treating physician's opinion. *See Sanchez*, 2015 WL at 736102, at *6-7 (even though the record included at least two consulting physicians' opinions, the record was a "far cry from that in *Tankisi* and similar cases, which have excused the ALJ's failure to seek a treating physician opinion based on the completeness and comprehensiveness of the record"); *see also Sigmen*, 2015 WL 5944254, at *5 (noting that *Tankisi* and *Swiantek* do not necessarily "preclude remand where an ALJ fails to request an opinion."); *Downes v. Colvin*, No. 14–CV–7147, 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015) (although the evidentiary record contained treatment notes, test results, and "direct assessments of [the claimant's] functional capacities" from consultative physicians, the ALJ could not have made an informed determination without the treating physicians medical opinions); *Moreira*, 2014 WL 4634296, at *7 (remanding where the ALJ failed to resolve "gaps and inconsistencies" in the medical record and heavily relied on a consultative examiner's report rather than seeking a treating physician's opinion). Accordingly, under the circumstances, the ALJ should have sought medical source statements from Plaintiff's treating physicians and erred by failing to do so.

Because the record is incomplete, the Court does not reach the question of whether the ALJ's decision was supported by substantial evidence. *Clark v. Colvin*, No. 15-cv-2286, 2016 WL 4679730, at *5 (S.D.N.Y. Sept. 7, 2016) (citing *Lacava v. Astrue*, 2012 WL 6621731, at *11 (S.D.N.Y. Nov. 27, 2012)). On remand, the ALJ is directed to contact STFHC to obtain the entirety of Plaintiff's treatment records from February 2012 through January 2014—particularly from Beverly Robert and Keith Carter—and to request medical source statements opining on what Plaintiff is still capable of doing despite her depression. Further on remand, the ALJ should

consider Dr. Camille's June 2014 report with any new evidence obtained.[13]

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is GRANTED

and the Commissioner's motion is DENIED.  Pursuant to 42 U.S.C. § 405(g), the Court reverses

the decision of the Commissioner and remands this case for further proceedings consistent with

this opinion.  The Clerk of Court is respectfully requested to enter judgment accordingly.

SO ORDERED.


_/s/ Pamela K. Chen_____
Pamela K. Chen
United States District Judge


Dated: September 30, 2016
      Brooklyn, New York

---

[13] The Court notes, however, that Dr. Camille's checking of a box indicating that Plaintiff was unable to work for at least 12 months is a conclusory opinion that does not relate to the "nature and severity" of Plaintiff's impairments, but rather, constitutes a disability determination that falls within the exclusive domain of the Commissioner.  20 C.F.R. §§ 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that a claimant is disabled cannot itself be determinative.").